**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **OCIE L. BRUMMELL, Administratrix** | : | **Civil No. 1:09-CV-1816** |
| **of the Estate of Malcolm Brummell,** | : | |
| | : | |
| **Plaintiff,** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **CITY OF HARRISBURG, CHARLES** | : | |
| **KELLAR and MARC MOULE,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION AND ORDER

### I.    Statement of Facts and of the Case

This is a civil rights case brought on behalf of the estate of Malcolm Brummell, an individual who was shot and killed on the early morning hours of September 23, 2007, by Marc Moule, who was then an off-duty Harrisburg Police officer. On September 21, 2009, Ocie Brummell, as the administratrix of Malcolm Brummell's estate, brought this action, naming Moule, along with the then chief of police for the Harrisburg Police Department, Charles Kellar, and the City of Harrisburg as defendants. With respect to Kellar and the City of Harrisburg, the plaintiff's complaint couches the liability of these defendants in the following terms:

> 25. The City of Harrisburg and the Bureau of Police, under the leadership of Defendant Kellar, have lacked, and continue to lack, sufficient safeguards to prevent police officers like Officer Moule from

engaging in lethal behavior such as prematurely discharging a firearm without justification.

26. The City of Harrisburg and the Bureau of Police, under the leadership of Defendant Kellar, have lacked, and continue to lack, sufficient safeguards to prevent police officers like Officer Moule from profiling and targeting African Americans.

27. The City of Harrisburg and the Bureau of Police, under the leadership of Defendant Kellar, have failed to train adequately their police officers so as to minimize or prevent police officers like Officer Moule from engaging in lethal behavior such as prematurely discharging a firearm without justification.

28. The City of Harrisburg and the Bureau of Police have failed to train adequately their police officers so as to minimize or prevent police officers like Officer Moule from profiling and targeting African-Americans.

29. Such abjectly deficient training and supervision by Defendant Kellar and the Bureau of Police were evidenced by Defendant Moule's extremely tactically inadequate actions, including his failure to notify the police department immediately at the time he observed the events that gave rise to the instant suit and his failure to properly identify himself with a proper police badge, insignia or any other readily identifiable police gear when he approached the scene of the purported altercation on the night in question.

30. The City of Harrisburg and the Bureau of Police, through their lack of sufficient supervision, have created and fostered an environment that encourages behavior amongst its police officers that is consistent with the behavior described herein by Officer Moule.

(Id.)

Thus, as to defendants Kellar and City of Harrisburg, the plaintiff's complaint is expressly premised on a failure to adequately train and supervise Officer Moule. Set against the backdrop of these allegations, the parties are now embroiled in a discovery dispute which we have been asked to resolve. This dispute relates to a request by the plaintiff to obtain discovery which may assist them in proving what they have alleged with respect to Kellar and the City of Harrisburg.

Specifically, in the course of discovery, the defendants have provided the plaintiff with the police department's Internal Affairs investigation report into the September 2007 fatal shooting of Brummell, and have also identified other internal investigations into excessive use of force complaints leveled against Harrisburg Police Officers during a 9-year period from 2000 through 2009. The defendants have provided a summary of these other reports to the plaintiff, but have declined to produce these other  internal affairs reports in their entirety, citing executive and deliberative process privileges. Arguing that the reports may reveal systemic shortcomings in training or conduct by Harrisburg police, and contending that the reports may also provide grounds for a punitive damages claim in this case, matters which may be relevant to the plaintiff's claims against Kellar and the City of Harrisburg, the plaintiff seeks wholesale disclosure of these reports.

This discovery dispute was referred to the undersigned for resolution. Following a conference with counsel, we elected to conduct an *in camera* review of a selected sample of the reports to determine whether disclosure of the reports was necessary or proper. The defendants have provided us with a sample, consisting of five of the reports. Having conducted this *in camera* review, we will deny the motion to compel production of these reports, with one narrow exception which we discuss below.

## II.   **Discussion**

### A.   **Standards of Review**

Several basic guiding principles inform our resolution of the instant discovery dispute. At the outset, Rule 37 of the Federal Rules of Civil Procedure governs motions to compel discovery, and provides that:

> (a) Motion for an Order Compelling Disclosure or Discovery
>
> (1) In General. On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. . . .

Fed. R. Civ. P. 37(a).

The scope of what type of discovery may be compelled under Rule 37 is defined, in turn, by Rule 26(b)(1) of the Federal Rules of Civil Procedure, which provides as follows:

(1) Scope in General.  Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense – including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  All discovery is subject to the limitations imposed by Rule 26(b)(2)( C ).

Fed. R. Civ. P. 26(b)(1)

Rulings regarding the proper scope of discovery, and the extent to which discovery may be compelled, are matters consigned to the court's discretion and judgment. Thus, it has long been held that decisions regarding Rule 37 motions are "committed to the sound discretion of the district court." DiGregorio v. First Rediscount Corp., 506 F.2d 781, 788 (3d Cir. 1974). Similarly, issues relating to the scope of discovery permitted under Rule 26 also rest in the sound discretion of the Court.  Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 90 (3d Cir. 1987). Thus, a court's decisions regarding the conduct of discovery, and whether to compel disclosure of certain information, will be disturbed only upon a showing of an abuse of discretion.  Marroquin-Manriquez v. I.N.S., 699 F.2d 129, 134 (3d Cir. 1983).This

far-reaching discretion extends to rulings by United States Magistrate Judges on

discovery matters. In this regard:

> District courts provide magistrate judges with particularly broad
> discretion in resolving discovery disputes. <u>See Farmers & Merchs. Nat'l
> Bank v. San Clemente Fin. Group Sec., Inc.</u>, 174 F.R.D. 572, 585
> (D.N.J.1997). When a magistrate judge's decision involves a
> discretionary [discovery] matter . . . , "courts in this district have
> determined that the clearly erroneous standard implicitly becomes an
> abuse of discretion standard." <u>Saldi v. Paul Revere Life Ins. Co.</u>, 224
> F.R.D. 169, 174 (E.D.Pa.2004) (citing <u>Scott Paper Co. v. United States</u>,
> 943 F.Supp. 501, 502 (E.D.Pa.1996)). Under that standard, a magistrate
> judge's discovery ruling "is entitled to great deference and is reversible
> only for abuse of discretion." <u>Kresefky v. Panasonic Commc'ns and Sys.
> Co.</u>, 169 F.R.D. 54, 64 (D.N.J.1996); <u>see also Hasbrouck v.
> BankAmerica Hous. Servs.</u>, 190 F.R.D. 42, 44-45 (N.D.N.Y.1999)
> (holding that discovery rulings are reviewed under abuse of discretion
> standard rather than de novo standard); <u>EEOC v. Mr. Gold, Inc.</u>, 223
> F.R.D. 100, 102 (E.D.N.Y.2004) (holding that a magistrate judge's
> resolution of discovery disputes deserves substantial deference and
> should be reversed only if there is an abuse of discretion).

<u>Halsey v. Pfeiffer</u>, No. 09-1138,  2010 WL 3735702, *1 (D.N.J. Sept. 17, 2010).

This broad discretion extends to both the substantive and the procedural

aspects of a discovery ruling. Thus, the court has the discretion to fashion procedures

that will promote informed decision-making in this field, including the procedure of

relying in proper cases upon an *in camera* review of a sample of the contested

documents when making decisions regarding the appropriate scope of discovery. <u>See</u>

Mid-West Paper Products, Inc. v. Continental Group, Inc., 596 F.2d 573 (3d Cir. 1979).

This discretion is guided, however, by certain basic principles. Thus, at the outset, it is clear that Rule 26's broad definition of that which can be obtained through discovery reaches only "nonprivileged matter that is relevant to any party's claim or defense." Therefore, valid claims of relevance and privilege still cabin and restrict the court's discretion in ruling on discovery issues. Furthermore, the scope of discovery permitted by Rule 26 embraces all "relevant information" a concept which is defined in the following terms: "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

In this case, the defendants have invoked a claim a privilege, asserting that Brummell's claims of relevance must be weighed against the governmental privilege recognized in federal court relating to investigative records. These cases acknowledge a governmental privilege but enjoin courts to balance the confidentiality of governmental files against the rights of a civil rights litigant by considering:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by

disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any intra-departmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiffs suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiffs case.

Frankenhauser v. Rizzo, 59 F.R.D. 339, 344 (E.D. Pa. 1973). Thus, assessment of these privilege claims typically entails a fact-specific and multi-faceted analysis of the competing interests of these parties.

In conducting this analysis we note that a party moving to compel discovery bears the initial burden of proving the relevance of the requested information. Morrison v. Philadelphia Housing Auth., 203 F.R.D. 195, 196 (E.D.Pa. 2001). Once that initial burden is met, "the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." In re Urethane Antitrust Litigation, 261 F.R.D. 570, 573 (D.Kan. 2009).

In assessing these competing claims of privilege and relevance we must also be mindful of the substantive legal standards that govern liability of supervisory officials, like defendant Kellar, and municipalities, like the City of Harrisburg. In considering claims brought against supervisory officials arising out of alleged Eighth Amendment violations, the courts  recognize that supervisors may be exposed to liability only in certain, narrowly defined, circumstances. For example, supervisory liability will rest on the basis that supervisors maintained deficient policies that resulted in the plaintiff sustaining an Eighth Amendment injury.  In these kinds of cases based upon allegations of deficient policies, the Third Circuit has fashioned a four-part test based upon the reasoning of City of Canton v. Harris, 489 U.S. 378 (1989), for supervisory liability on an Eighth Amendment claim for failure to supervise.  Under this test, "the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (3) the injury resulted from the policy or practice." Beers-Capitol, 256 F.3d at 134 (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).  Accordingly, these approaches are summarized as follows:

> In sum, to make out a claim of deliberate indifference based on direct
> liability (i.e., insofar as the defendants are alleged to have known of and

ignored the particular risk . . . posed, the plaintiffs must meet the test from <u>Farmer v. Brennan</u>:  They must show that the defendants knew or were aware of and disregarded an excessive risk to the plaintiffs' health or safety, and they can show this by establishing that the risk was obvious.  For the plaintiffs' claims seeking to hold supervisors liable for their deficient policies, <u>Sample's</u> four-part test provides the analytical structure for determining whether the policymakers exhibited deliberate indifference to the plaintiffs' risk of injury, it being simply the deliberate indifference test applied to the specific situation of a policymaker.

<u>Id.</u>

Furthermore, it is equally clear that a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. Quite the contrary, to state a <u>Bivens</u> constitutional tort claim the plaintiff must show that the supervisory defendants actively deprived him of a right secured by the Constitution.  <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902 (3d Cir. 1997); <u>see also Maine v.Thiboutot</u>, 448 U.S. 1 (1980). Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286 (3d Cir. 1997).

In particular, with respect to prison supervisors it is well-established that:

"A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be

predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir.1988).

<u>Evancho v. Fisher</u>, 423 F.3d 347, 353 (3d Cir. 2005).

As the Supreme Court has observed:

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . <u>See</u> <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also <u>Dunlop v. Munroe</u>, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); <u>Robertson v. Sichel</u>, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution

<u>Ashcroft v. Iqbal</u>,  129 S.Ct. 1937, 1948 (2009).

As for municipal defendants like the City of Harrisburg, the Supreme Court has recently reaffirmed the guiding principles which define municipal civil rights liability in this setting. In <u>Connick v. Thompson</u>, – U.S.– , 131 S.Ct. 1350, 1359 (2011), the Court described the parameters of municipal liability in the following terms:

A municipality or other local government may be liable . . .if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. See <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 479(1986) . . . . They are not vicariously liable under § 1983 for their employees' actions. . . . Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. <u>Monell</u>, 436 U.S., at 691. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. . . . . These are "action[s] for which the municipality is actually responsible." <u>Pembaur, supra</u>, at 479–480.  In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. See <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell* "). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." . . . . Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. . . . " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." . . . . Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.

<u>Id</u>.(some citations deleted).

With these guiding principles in mind, we turn to an assessment of the parties' competing positions regarding disclosure of these investigative reports.

**B.**     **The Plaintiff is Not Entitled to Wholesale Disclosure of The Harrisburg Police Internal Affairs Reports**

In this case, the Court has conducted an *in camera* review of a sample of these investigative reports. See Mid-West Paper Products, Inc. v. Continental Group, Inc., 596 F.2d 573 (3d Cir. 1979). The sample size selected by the Court in consultation with counsel was significant, consisting of 5 reports, and was specifically designed to identify those reports which might be most pertinent to the issues in this case. Thus, the sample consisted of: (1) one report relating to a separate incident involving Officer Moule, which occurred after the events described in this civil action, but during Chief Kellar's tenure; (2) two reports closest in time to the events in this complaint which involved fatalities and in which the investigation exonerated the officers; and (3) two reports closest in time to the events in this complaint in which the investigation found misconduct by the officers. Together, this sample consisted of approximately 1,900 pages of material, and provided the Court with an adequate basis for making a fully informed assessment of the issues of relevance and privilege framed by the parties.

Our review of these reports leads us to conclude that wholesale release of the reports, requested by the plaintiff, is not warranted here since the reports do not contain information that is relevant to the plaintiff's claims in this lawsuit. In

particular, we find from our review of the reports that they do not contain information that is relevant to, or supportive of, Brummell's claims of supervisory or municipal liability in this case. Thus, with respect to Brummell's supervisory liability claims, these internal affairs reports do not "identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (3) the injury resulted from the policy or practice." Beers-Capitol, 256 F.3d at 134 (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989). Similarly, with respect to Brummell's municipal liability claims these reports do not contain information that meets the standards of proof prescribed by Connick for such claims. In particular, nothing in these records reveals that:

> [The]  municipality's failure to train its employees in a relevant respect . . . amount[ed] to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact. . . ." '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."

Connick v. Thompson, – U.S.– , 131 S.Ct. 1350, 1359 (2011)(citations omitted). In sum, nothing in the reports reveal that "city policymakers [we]re on actual or constructive notice that a particular omission in their training program causes city

employees to violate citizens' constitutional rights, [an instance where] the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Id.

Quite the contrary, our review of these materials reveals that these reports are thorough and comprehensive. Each report reflects a careful, balanced, dispassionate analysis of the facts and circumstances surrounding a specific use-of-force incident. The reports indicate that the police department had rigorous use-of-force training programs and policies in place, and carefully assesses whether the actions of particular officers comported with, or deviated from, those policies and programs. Thus, the reports do not reveal any systemic weaknesses in training, or deliberate indifference by policymakers, but rather appear to represent a conscientious effort to ensure that police meet high standards of conduct in their encounters with the public. Since the reports, as a whole, do not contain information that would be relevant to the plaintiff's musical and supervisory liability claims, and are otherwise cloaked in an executive, investigative privilege, Frankenhauser v. Rizzo, 59 F.R.D. 339, 344 (E.D. Pa. 1973), the plaintiff's request to compel wholesale disclosure of these reports will be denied.

C.    **In the Exercise of Our Discretion We Will Order Limited Disclosure of Information From One Report Relating to Officer Moule**

While we have concluded that wholesale disclosure of these reports is not warranted here, we do find that one, narrowly tailored disclosure should be made by the defendants in this case. Among the reports which the Court reviewed *in camera* was Report No. 090602, which described the Internal Affairs investigation of a shooting incident involving Officer Moule which occurred on June 18, 2009, some twenty months after the events that lie at the heart of this lawsuit. The plaintiff requested that we examine this subsequent incident report, in part, to determine whether the report revealed matters that might be relevant to the plaintiff's punitive damages claim.

Relevance is defined broadly under Rule 26 and is described in the following terms: "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Given the broad definition of relevant evidence in a discovery context, which embraces information "reasonably calculated to lead to the discovery of admissible evidence," we find that a limited disclosure of information from this Internal Affairs report is appropriate. Specifically, our review of this report reveals that, on page 12 of the

report, investigators determined that Officer Moule made statements to them during this inquiry regarding some collateral matters that proved to be untrue.

While these false statements post-date the events in this lawsuit, this finding of a lack of candor by Officer Moule during an Internal Affairs investigation into a police shooting incident may be "reasonably calculated to lead to the discovery of admissible evidence," since knowledge of this fact would permit the plaintiff to engage in a line of inquiry of all defendants regarding the extent and degree to which they ensured that information previously provided by Officer Moule regarding the September 2007 Brummell shooting was full, complete, and accurate. The responses to this line of inquiry, in turn, may lead to the discovery of admissible evidence. Accordingly, since this information could potentially lead to the discovery of admissible evidence, this information has some relevance to the issues raised in the instant lawsuit, and the relevance of this information outweighs any claim of a limited investigative privilege. Therefore, we will order the defendants to release page 12 of Internal Affairs Report 090602, as well as the reports of interview with Officer Moule contained in that report.

### III.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's motion to compel disclosure of Harrisburg Police Department Internal Affairs reports is DENIED, in part, and GRANTED, in part, as follows: The motion. is GRANTED

as follows: the defendants are ORDERED to produce page 12 of Internal Affairs Report 090602 to plaintiff within seven days from the date of this Order.  In all other respects, the motion is DENIED.

So ordered this 8th  day of July, 2011.

**_S/Martin C. Carlson_**
Martin C. Carlson
United States Magistrate Judge